Oyez, oyez, oyez. A person is having business before the Honorable, the United States Court of Appeal for the District of Columbia Circuit. I reminisce to draw near and give their attention, for the Court is now sitting. God save the United States and its Honorable Court. Be seated, please. Case number 18-5227, Libertarian National Committee, Inc., Appellate v. Federal Election Commission. Mr. Gura for the appellant, Mr. Feeler for the appellee. Good morning, Mr. Chief Judge, and may it please the Court, I'm Alan Gura for the Libertarian National Committee. The District Court correctly rejected the FEC's standing claims. I'll start with a more simple and straightforward one. The FEC forbids the LNC from spending money to speak on the basis of the speech's content. As the FEC describes the Cromney-Bus restricted spending account on page 48 of its brief, quote, each category of expenses serves a different purpose and frequently features a discussion of different issues and priorities. Close quote. By enforcing this content-based speech restriction, the FEC injures the LNC, not just with respect to Shaver's request, which I'll get to in a moment, but with respect to all donors. The record manifests this injury as to Ruffer, Chastain, Clenard, and Redpath, and there are obviously many more. Count two of the complaint, appendix page 15 and 16, and specifically paragraph 31, which had to be interpreted in the light most favorable to the LNC, challenged this specific injury. It led to the second certified question, which squarely presents this injury and no other. Now, the LNC does believe that it would have more electoral success if its rights were not violated. And while it happens to be true that the Cromney-Bus scheme has a disparate impact on smaller parties, neither of these points is relevant to the fact that the content-based speech restrictions work and injure, in fact, traceable to the FEC and addressable by this Court, which is the injury addressed by the second certified facial challenge question. Moving on to the Shaver as applied injury and the FEC's calculator problem, I will use the FEC's math, but unlike the FEC, I will also follow the FEC's advisory opinion. Because when this lawsuit was filed, we didn't have the FEC's litigating position. We had the FEC's advisory opinion. The FEC's reply brief on its motion to dismiss fails to mention its own advisory opinion, but it will not go away. This opinion instructed Shaver's trustee and the LNC not to do the very thing that the FEC now wishes we would have done, exercise discretion as to the amount of contributions taken from the trust. The FEC concedes, as it must, that no matter what, in 2015, the LNC could not have absorbed all of Shaver's gift. Let's use the FEC's math. Table 1, page 8 of their motion, which shows that in 2015, even with a maximum building contribution, the LNC could have absorbed a little over $141,000 of a bequest that exceeds $235,000. So where was the other $94,000 supposed to go? The FEC made two suggestions. First, the general counsel telephoned Ms. Shaver's lawyer and asked that the LNC take the entire bequest, subject to the content-based restrictions, not because the LNC could then spend the money right away, but so that it could recover the overage sometime in 2016. Let me just ask you a question, and that is, accepting your view of the math for these present purposes, given that the money is already locked into an escrow account that's set up just the individual contribution amount each year, can you just explain to me how, if you were to obtain the declaratory relief or injunctive relief that you seek, that would change anything, given the terms of the escrow? Does the escrow itself allow for adjustment based on? The terms of the escrow itself reflect litigation. It does reserve the right to withdraw the full amount if the restrictions were declared unconstitutional. In fact, the FEC's motion at page 19 states that the court could allow, I'm quoting here, their language, not mine, a court could allow the LNC access to the remaining Shaver funds being held in escrow. So in that sense, they concede that it's redressable. They also concede, of course, that we're not actually allowed to take it out of the escrow, that these restrictions are, in fact, in place. And so they haven't exactly changed their mind. They sometimes suggest they do, but here they suggest that that's not the case. Sorry, rather than what they're talking about, I want to make sure I heard you correctly, and I'm sorry the sound isn't great in here, and that is that the way that escrow is set up, that development of this litigation would then allow you to change the course of payments. I just want to make sure I got that right. That is correct, Your Honor. That is correct, Your Honor. And so at the time that this lawsuit was filed, we had this advisory opinion. The advisory opinion was very clear. The LNC can't pledge, assign, or commit the money in advance. And as Your Honor noted, the maximum amount and no other can come out every year until it's exhausted. So even if today they got up and gave us a clear waiver, unlike the sort of waiver we have in their brief, but if we had a clear waiver today and the money could come out by lunchtime, the injury still existed at the time that the lawsuit was filed, and that brings us, of course, to the capable repetition yet evading review problem, because even if they were to moot. I just want to, I think everybody, you're all, both sides are in agreement on this, but by the second year, had you put the money each time into the building fund, you could have absorbed all the money, right? Not that it would have displaced other money, but you could have put $120,000 or so each year plus the 30-some thousand the first year. So by the beginning of 2016, you could have taken all the money. Not for the purpose you wanted it for, but you could take it all. Not exactly, Your Honor. It could not have all gone to the building fund, because the maximum contribution limit for the building fund was $100,200. They would have had to use two funds. So not just the building fund. They would have had to use the building and probably the presidential convention fund. No, what I mean is in 2015, you could have taken the 33-9. They took 33-400, which was the limit at the time, immediately. Right. And then you could have taken, I don't know, $101,000, $102,000 each year or something like that? In 2015. You could have taken in 2015 about $100,000 and then the remainder in 2016. In 2015, it could have been possible to structure it such that the money would have been paid out in 2016, but it could not be absorbed and paid in 2015 because there were not sufficient offsetting expenses. That's on the offsetting point. I'm not asking about that. Yes. You were permitted to put $101,000 something into the building fund, right? Correct. And then the second year, you could have put another $101,000 into the building fund. In 2015 and then in 2016. No, in the second year, nothing could move from the escrow into the building fund. At the beginning, when you're deciding, before you made the escrow decision, you could have put $33,000 in the general and you could have put $101 something. That's correct. And in the second year, you could put another $101,000 into the building fund. In the second year, that $100,000 could have been spent, but no, the state had to distribute the money. The money was there. I don't think that the LNC had the option of saying, well, we'll take some of the bequest today and we'll take some of the bequest tomorrow. At that point, they're exercising discretion and control. Before you had the escrow, you set up an escrow that permitted $33,000 every year. That's correct. You could have set up an escrow that set up $33,000 the first year and $101,000 the first year and then $101,000 the second year. No, Your Honor, because that was forbidden by the advisory opinion. The advisory opinion defined the contribution limit to be taken out every year. As the $25,000 adjusted for inflation, footnote 2 said it was $33,400. They said you can only take the maximum. It reflected the understanding that the amounts could not be varied. This goes back to the FEC's theory of when it is that you control money. If the party has any ability to vary the contribution amounts, then at that point the FEC conceives that you're controlling the money, therefore you've received it and you've violated the law. That's why the advisory opinion specifically states, it references their previous guidance that states that, I'm quoting here, the trustees would exercise no discretion regarding the amount of the contributions. So the contribution withdrawal limit is fixed. There's no way to alter and vary the amount of the contributions and that's an advisory opinion. Your Honor is correct about one thing. They could have given us any advice they wanted to. They could have written a different opinion, but they did not. So the problem is not the statute. The problem is FEC erred as a matter of administrative law. The problem is the statute because even if the FEC had been as generous as they wanted to be, there would still have been the problem of an injury in 2015, which is that the LNC had a request that they simply could not absorb because the Congress had decided to restrict the FEC's ability to spend money based on the content of their speech. And that is a content-based restriction subject to scrutiny, even if we say that it's a contribution limit. And I think it's an expenditure limit. The district court said it's a combination of both. You have a statute that uses the word use three times. Here's how you can use the money. And it's not a restriction on what the donor can do. It's the restriction of what the party can do with its money, and they have various content-based... How is that distinguished from McConnell's discussion of soft money and the way money can be used under FECA? McConnell actually helps us out because McConnell stressed that the soft money ban was constitutional because it applied regardless of how the money was spent. That language appears in McConnell, and I believe in the other cases as well, that followed from it. But it could only be spent for a certain category. That's right. In McConnell, actually, the soft money ban was upheld because the limit applied no matter what the party would do with the money. Here we have the opposite situation. The limit changes based upon what the party does. Isn't that the same as the Levin funds? I'm sorry? Isn't that the exact same as the Levin funds that were upheld in McConnell? No, Your Honor. The Levin funds issue is not exactly the same. I believe Levin funds refers to the state-coordinated... I know, but it says here are the specific things that these funds can be used for, voter registration, get-out-the-vote drives, specific things that can't be used for other... There's pools of money that can only be used for specific things. Are those content-based discriminations that should have been subject to strict scrutiny in McConnell? Nobody raised that issue in McConnell. I'm asking you what your opinion is of Levin funds. My opinion here is that that would be an interesting dispute. How would you distinguish that? I would say that there would be a problem with that type of restriction. So your position would take down the Levin funds if we view that as content-based discrimination on expression? I think at that point... It would be subject to the same analysis. Well, I believe the Levin funds also involve coordination with state and local issues, if I'm remembering the correct provision. And so, you know, it could have been, as the district court noted, that the court would take a different view of restricting money spent on federal elections and money spent on other things. The Congress has a greater role in regulating federal elections, but the McConnell vote did tell us a couple of other things. Just to be clear, as to whether or not Levin fund restrictions are content-based, you can think of no way to distinguish those limitations from the ones here. So if one counts as content-based, the other does. You know, I can't commit to that. I suppose that it would be a very strong argument. But the problem, though... Why can't you commit to it? I don't see the difference. Okay, the difference is that if you get down to the question of whether or not the Levin funds are going to be upheld or not, even as content-based restrictions, it's a very different type of situation because you're seeing Congress regulating things that are somewhat apart from federal elections. But McConnell did tell us, McConnell did not leave us without guidance here. McConnell told us that... Are you suggesting that a content-based restriction would be more likely to survive scrutiny if it was... A content-based restriction? I don't understand your point about your effort to distinguish. Congress can say we have an interest in regulating federal elections in the interest of preventing corruption, let's say, okay? Congress has a much lower interest in regulating other elections. But McConnell, if I might, Your Honor, point out, did give us some guidance on this issue. McConnell gave us actually two examples, two situations at which we can distinguish expenditure limits from contribution limits. First of all, it said if the speech is burdened in a way that a direct restriction does not, would not, then you have an expenditure restriction. Here we do have a burden on speech in a way that a direct restriction does not. McConnell also gave us an example. Sorry, I didn't catch that. Could you just run that? If the restriction burdens speech in a way that a direct restriction does not, then it would be an expenditure restriction under McConnell. That's at pages 138 and 139. Here we have limits on how to use the money. So we have here a burden on speech and that burdens speech in a way that direct restrictions don't. But in McConnell, you had limits on how to spend the money. There's no difference between spend and use. But McConnell's dollar amounts did not fluctuate. McConnell specifically held that it didn't matter how the money was used. If you're looking at how funds could be, you know, the soft money ban of 3125 before it was modified in the Crowley Post. But the content restriction here applies to the donor. The Libertarian Party can still spend as much as it wants. It just has to spend it from other sources. The restriction is on what the party can do with the money that it's been given. But it doesn't limit the overall amount the party can spend. I'm sorry, Your Honor? It doesn't limit the overall amount the party can spend. It just limits the party's ability to spend the money from this donor. Your Honor, I would respectfully disagree with that. And the facts here show otherwise. It does limit the total amount of money that parties can spend because if the parties don't have sufficient offset expenses, for example. But you don't argue that in this case. You never make that argument. You've never argued that this limits the Libertarian Party's ability to participate in the process. We did argue, and we argue, I think, quite strenuously, that it limits the total amount of money the party can spend, which obviously is what happened in 2015, because there was no presidential nominating convention that year. And the legal proceedings didn't total much more than $7,200. And so what you have is a situation that says, well, you can spend more money on some things but on others, and if you don't have those offsetting expenses, the total amount of spending is going to be reduced. Now, that's not perhaps the problem in presidential years. But that's not right. I mean, if I'm a small party and I'm unable to raise very much money, that's not an expenditure limitation. That's my inability to raise more money. And just because I might have, you know, something in a 401K plan or something that's somehow restricted, the existence of that restriction is not an expenditure restriction on me. You're not making that argument, are you? I'm making two arguments. The first argument is that actually it does limit how much money you can raise because you have donors, and the record establishes this. We have certified facts. The donors are withholding money. They've already maxed out and they will not give more money because they don't wish to see the money wasted on these ridiculous things. Right. We understand that you're saying this money is restricted in the way that LNC can use it, but that's different from saying it's an expenditure restriction in the way the courts have traditionally looked at that. Or a limitation in terms of a cap. So you're saying it's a content-based restriction on the use of money that's in an account, but you're not saying that it otherwise restricts LNC's ability to use money from other sources on anything it wants. Well, it's true that the statute has not regulated all of the LNC's money, but it regulates 90% of what an individual might contribute. That's a severe restriction based on content of speech. And you have the Congress saying, look, you can give $339,000, but 90% of that we're going to require you only spend it in specially approved ways. Donors look at that and say, we don't want to give more money, so the party gets less money to spend any way you work it. And then if you don't have those offsetting expenses, then you can't make use of those funds. But you have a statute that specifically says you may not use money unless it's for these things. That's an expenditure restriction. It's a content-based restriction. Can I just ask a framing question? So you've been focusing on the expenditure side of it, meaning the outlay by the party, at the extent to which these provisions restrict the outlay by the party. Often with contribution ceilings, the First Amendment restriction is on the donor. It's conceived of as a restriction on the donor, but it sounds to me like your argument is not talking about the donor side of it. You're only talking about the party side of it. Is that right? Not exactly, Your Honor. The lawsuit was brought on behalf of the Libertarian Party, and also it's asserting the interests of its members and donors. The party is, of course, under Section 3110, one of the authorized plaintiffs, and it's here in that capacity. But it's also the donors who I believe are restricted from making donations under 3125. So, yes, the donor who would give, say, an oversized contribution would be in trouble, just as much as the party would be for accepting it, just as much as the party would be for soliciting it, just as much as the party would be for expending it. I guess I didn't read your briefs to be talking about the donor side of the equation. I read your briefs to be talking about the outlay side of the equation from the perspective of the party. Well, the party is the plaintiff here, and the party is being directly restricted. But the party suffers an injury here. It has a restriction which has some very severe consequences if it's violated on how it might spend its money based on speech. And so the question is, how can we justify this obvious content-based restriction? And the answer is, it's not our burden to do so. It's the FEC's burden. You still haven't answered our question that this content restriction only applies to the donor. It applies to the donor, not to the Libertarian Party. Could you just explain to me why that's wrong? Well, Your Honor, I believe that the statute does not allow donations that are in violation of the… Donations, but I'm talking about the ability of following up on Judge Srinivasan's question. You're representing the Libertarian Party, and it doesn't limit the Libertarian Party's expenditures. The expenditures of the Libertarian Party are limited because they can't spend the money unless it's spent on the correct ways, and they can't spend money they don't raise, and they can't raise money because donors are dissuaded from contributing based upon these restrictions. Right, so you're saying that it can't be the end of the inquiry, that someone makes a contribution. Let's say there's a fund that the government says that every party, there's a statute that says every party can have a Make America Great Again fund, and donors who want to do that can put money into that, but that can only be spent by the party to extol the theme, Make America Great Again, and your view is, well, wait a minute, that's a restriction on the party's speech because, yeah, we have that money, but we can't spend that for other purposes. That's your argument, right? I mean, just to make it very clear in terms of content viewpoint-based, there has to be, in your view, there has to be some speech protection on the recipient party in that kind of context if the fund at least makes a viewpoint restriction. Well, yes. I mean, look, let's suppose a donor gives money for the Libertarian Party and says, here's $100,000 and you can spend it on a convention. If that convention has a presidential nominating process, that money can be accepted. If that convention were to be one of the off-year conventions that they have in the off-cycle years and there's no presidential nomination at issue, then they cannot accept the money and they can't fund that type of thing. I think the question is, why is it content-based to say, in your view, to say you can only spend this on convention or building or litigation? If the government had a statute that said, we want to involve the youth of the country in political campaign activity, they need to know more about it. We have a lot of underemployed people. We are going to give every party funds for interns. We're going to give you money to employ interns. In some way, I mean, you're a party that the purpose of which is to speak, but does that mean that everything that the government does in terms of restricting money that can be given to a party is necessarily speech-based or content-based restriction? It seems like that is the basis of your argument. Well, if the restriction were that the funds could only be used on something that could not be conceived of as speech. Say my intern example. We're going to give you money, but you have to spend this money on the intern program. You can't spend it on an ad. You can't spend it in other political ways that you think would be more effective. You have to spend it on training these interns, giving them a desk, and giving them a stipend. Okay. Presumably these interns would be advancing the party's message in some way. They would be, in effect, speaking or helping the party speak in some sense, right? So at that point, the intern is a different purpose than an advertising and purpose. Function or purpose is part of the read analysis. Facial distinction is based on message. Whether they regulate the speech as subject matter, that's the easy part, but also function or purpose. So your view is that would be content-based? Yes. I mean, you have here, look, this is the Supreme Court's instruction in the town of Gilbert. The content-based laws, those that target speech based on its communicative content are presumably unconstitutional, but facial distinction based on message, that's the easy one. If they say you can make this message, not the other one, that's the one we classically think of. But also the speech's subject matter, function, or purpose. In a presidential nominating convention, an election recount or contest, this is actually the language of the third provision in the Cronenberg's aspect. They say, well, you can use the money for an election contest or recount. That seems to me to be money used in political litigation. Isn't it your position that Reed overruled McConnell? Isn't that, is that what you're arguing here? No, I don't believe that McConnell. In McConnell, the court upheld barring the expenditure of soft money on federal election activities. That is certainly a purpose, right? That's exactly what the court did. It upheld the barring of expending money on, of expending soft money on federal election activity. And the court said they limit the, they are not expenditures, they limit the source and individual amount of donations, that they do so by prohibiting the spending of soft money does not render them expenditure limitations. They're only then contribution limitations. It's a necessary backstop to the regulation of contributions to limit the way in which the contributions are then spent and they're not considered expenditure. So I don't understand how you survive McConnell unless your position is that Reed overruled McConnell. It's not just Reed and McConnell. May I introduce Holmes, which this court decided. The Holmes case where this court was called upon to give a definition of what a contribution limit is. Holmes couldn't have overruled. However much we might like to overrule the Supreme Court, we don't have that power. Oh, I understand that. So we're stuck, and McCutcheon affirmed McConnell and public citizen, and citizens united. I keep mixing it up with public citizen. Sorry to both sides on that one. Again affirmed. So the only possibility here is that you think Reed overruled McConnell, and the Supreme Court has told us over and over again that even if we think that subsequent decisions weaken the Supreme Court opinion, we have to leave it to the Supreme Court to effectively overrule it. So I don't understand how this is different than the limitations on federal election activities in McConnell. The parties were allowed to spend money as much as they wanted on other things, but they couldn't spend these contributions on federal election activities. Your Honor, in McConnell, the soft money ban was upheld because the court specifically said, we don't care how the money is spent. All large contributions have the potential to create corruption or the appearance of corruption, and so we're going to simply say that we're going to uphold a ban regardless of how the money is spent. And that regardless, you could spend it on anything other than FEA. That was the only limitation. It wasn't regardless of how the money was spent. McConnell, I believe, does reference the fact that the contribution limit is lawful because it applies, you know, it doesn't matter what you do with the money. It does matter what you do with the money, doesn't it? Am I wrong about that? I thought the point of McConnell is that it restricted spending soft money on federal election activities, not on other things. McConnell restricted contributions. Yes. Okay. With the contribution, you couldn't spend it on certain things, namely, things defined as federal election activities. The contribution limit did not vary in McConnell based upon what you did with it. That is true. Okay, that's my point. In what way does it matter that there were different contribution limits? Here's why it matters, Your Honor. Because a contribution limit is a limit on the amount of money that can be given in a set time frame. That's what this Court held in Holmes. What is a contribution limit? The contribution limit says you can only give so much money in a given time frame. Those are the two ingredients. Here we have a third ingredient in the mix, which is the content of the speech which is being funded. That takes it out of McConnell. It takes it out of Holmes. It takes it out of a contribution limit. McConnell didn't involve a time frame. McConnell was an outright ban. McConnell limited the amount of contribution in a given year. It's an annual contribution limit. No, the soft money ban is a ban. That's right. You can give $1 for soft money. But the party limit in McConnell applied by time frame. So the challenge was to this law, to 3125, which said, here's the new restriction, folks. This is what you can give to a political committee. And people complained and said, well, you know, what about using it for other things? And the Court said, it doesn't matter what else you use it for. We don't want more money than this amount going in a given time frame. And that law is constitutional. Now, here we have a different law that introduces a third ingredient. I reserve respectfully the final 43 seconds of time, if I could have more. Continue to answer the question, unless you're finished. I'm finished with my answer things. I thought your argument critiquing the 2014 amendments was based on a failure by the FEC to show that there was an anti-corruption value in both the limits on a bequest from an uncoordinated, from a donor who had not coordinated the bequest with the Libertarian Party and for allowing different limits based on these three types of activity. Did I misunderstand you? I didn't hear you addressing that point. That's right, because I hadn't gone to that point, Your Honor, and thank you so much. Yes, it's true. It doesn't actually matter whether we're talking about a contribution limit or an expenditure limit, even if we're talking about what they say we're talking about, a 1974-style pure contribution limit with no content-based description. It has to be justified by an anti-corruption value, right? Yes, we still have, they still have the burden of showing, even under closely drawn scrutiny, they have the burden of showing that this imposition on speech is appropriate. Now, unlike McConnell and unlike all the other cases that have come before, we don't have a pure dollar limit. We have an expenditure restriction that's based on the content, on the use, and that they cannot justify. And we asked them to justify it, and they were all over the place. They said, well, Congress might have thought that it would be more corrupting, but then they also said that, you know, a larger contribution, regardless of how it's used, is going to generally be more corrupting. At the same time, a smaller unrestricted contribution might be more corrupting because parties value unrestricted contributions more. So which is it? Is it a larger contribution, less corrupting than a smaller one? Which way does it go? And their answer was, well, it depends. It depends upon – What about the findings of fact by the district court judge here? Is this court bound by them unless they're clearly erroneous? And you haven't made that – Yes, Your Honor, and in fact, that's why I believe we're entitled to it. Let's talk about some of those findings of fact. So look at paragraph, what is it, 59-71, starting at the joint appendix, JA-201, all of the evidence that the district court recites. Yes, this is an interesting exposition of historical incidents, Armand Hammer and the like, people who engaged in suspect activities. But the issue here is not a statute that's been targeted at Armand Hammer. The issue here is reflected in certified facts number 3940. So is your point that there has to be a finding as to this particular request? No, my point is that we have to analyze the statute that's before us, not the statute that was before the court in 1976. And the statute before us today is very different. Congress's findings as to the original statute are not to be considered when Congress amends the statute in 2014? Those findings are completely irrelevant. There's nothing in these facts, 59 and onwards, that talk about presidential nominating conventions, legal proceedings, and headquarters buildings. There's nothing in these findings that say a large contribution for your building is less corrupting than a small contribution for your ads. A large contribution for your presidential convention is less corrupting than a large contribution for your non-presidential convention. Those findings were never made. What else is going on? Because it just seems like the entire statutory backdrop is that there's a balancing between a concern about corruption and an interest in making sure that parties and candidates have enough money. So any adjustment has to be a reflection of that calibration, doesn't it? What else could have been going on? Your Honor, here's what's been going on. You had a midnight mechanism where things were in a hurry and the budget had to be passed. And Congress, even though it was regulating core First Amendment protected speech, did this thing without any debate, without findings, without any study. And they basically winked a nudge. They said, well, we'd like to have more money in the system. We know that we need more money in the system. But perhaps for reasons of appearance, we don't want to just raise the limit. So we'll say you can give more money for this and more money for that. And everyone knows, as Representative Slaughter said on the floor of the House, that once you have these House accounts, they can go to anything. And that's exactly what happened. You had a situation where they raised the limits effectively by a factor of 10. And the innovation here is that they say, well, if you funnel the money into these special accounts, then it's okay. And, of course, we all know that then the money comes out of the general fund if the funds are offsetting. But they didn't raise them to infinity because they could have just raised them to infinity in these categories. And they decided not to. They raised them to 300 percent. And it must have been based on an understanding that that's the level at which the interest in corruption doesn't trump the interest in making sure there's adequate funding. Your Honor, I would urge the Court, actually, to defer to Congress's decision to raise. If Congress felt that the limit can no longer be $39,000, it needs to be $339,000, that's fine. Let's defer to Congress's desire to make the limit $339,000. Why these categories? Why these categories? Why did Congress identify these categories to raise the limits? Well, that's a great question. I wish Congress would have told us a little bit more about it. But the record is bereft of any kind of investigation as to why these categories are less corrupting. But let's talk about the FECs. Who benefited most from these categories? Who benefits from this? The two major parties that have multimillion-dollar conventions and very large building operations. And now they're being very creative about it. Well, we know, do we not, at least, as you point out, there isn't much legislative history. But we do know that Congress had decided that presidential conventions would no longer be funded by public money. That's right. And so there was an interest in figuring out how to get additional money to the parties. That's right. And it doesn't detract from your point, but there is some indication that Congress thought that building funds and funding legal challenges and recounts were not so tied to the type of election activity that was of concern. The FEC told us what the concern is, actually. The FEC said the great concern is that unrestricted contributions can be used specifically to benefit specific people. And that's why they raise a particularly acute risk of corruption or the appearance of corruption. And so here you have the exact opposite going on with these limits, because you have extra money being allowed to fund what? The outcome of individual people's elections, election recounts and contests, and presidential nominating conventions, which are, of course, geared towards nominating a presidential ticket. So it doesn't make sense. Their explanation is we don't want more money going to these things that can benefit particular people, yet they say that in defending an act which does exactly that. Well, what about building funds? I mean, that's money that's not going to a candidate or candidates. It's not even going to an election or an election cycle. It's going to benefit all candidates over all elections for the life of the building. So why isn't that category just on its face, not triggering the type of corruption concerns that the rest of the scheme addresses? Because the FEC and the Congress have the burden to show us why the building fund category is less problematic. I just told you why on its face. It's got nothing to do with candidates, election, election cycle. It just doesn't have anything to do with that. That's right. So it would have been great if Congress had explained why then. What more needs to be said? Well, Congress needs to still say. Now, I was merely responding to the FEC's offer. But I'm just asking you my question, which is why as to that category on its face. And given the long history where Congress has explained what the concern is that it's trying to address through limitations, why does that one just not implicate it? Because it's completely irrational because you can give a billion dollars to the building fund and that frees up an equal amount of money in general funds that can be spent for anything you want. It's a restriction without any teeth in it for most people. I thought the heart of your argument was that restricted and unrestricted funds are not fungible. Okay. There is a fungibility issue. That's certified fact number 38. Every contribution. Isn't your position that restricted funds and unrestricted funds are not fungible? Restricted contributions are very fungible, Your Honor. That's our position. We've always made the distinction. The FEC tries to blur the line. Restricted contributions are fungible with what? There is a line blurring which is present throughout the FEC's argument between funds and contributions, and these are different things. Funds, money sitting in a bank account, subject to restriction, are not fungible with funds sitting in another bank account that are unrestricted. Contributions are different. If the party knows that it can raise money to offset an upcoming expense on a building, on a convention, on a recount for somebody, then it knows that that will free up an equal amount of money in the general funds to be spent elsewhere. It seems like that hurts your injury argument. When it comes to injury, you don't want it to be fungible, and the FEC does the same thing in reverse. On this area, you want to say it's all fungible, but Congress could have thought when a donor makes a restricted donation that will only be used on buildings, that that wasn't going to create the type of corruption concerns tied to candidates or elections that the regulations have always been for. That would be a rational basic analysis. Congress could have thought this. Congress might have done that, but the burden here is even under closely drawn scrutiny, it would still be a form of intermediate scrutiny. Just an argument that it is corrupting? Other than this fungibility point? It could be very corrupting for the party to take a $100,000 plus donation, ostensibly for a building, and everybody knows that into the building fund you can squeeze all kinds of things, and that's essentially an unrestricted contribution. A building fund donation is an unrestricted contribution? Because if a party spends, and you've seen the numbers on how much some of these parties spend on their so-called buildings, if you know you're going to have a million dollars of building expenses, and you're going to write a check for a million dollars for everything that's in your building next year, or even this year, and somebody says, well, here's a $100,000 check for the building fund, and it goes to the building fund, that frees up $100,000 out of the general fund that would have been spent on the building for anything the party wants, which it might appreciate a great deal, which is why the FEC says, their first answer, they gave all kinds of conflicting answers, their first answer says, generally, larger contributions are more likely to corrupt, regardless of how the money is spent. Well, that sounds like this is an irrational scheme. Then they turn around and say, well, wait a minute, a smaller contribution might be more corrupting because it's unrestricted. So how do you tell the difference? Aren't the corruption you're talking about the same corruption McCutcheon was talking about? The same corruption or appearance of corruption that McCutcheon was talking about? Corruption or appearance of corruption can take many forms. No, it is what you're talking about here, what you think there could be in the building fund, the same thing that the Supreme Court discussed in McCutcheon, or is it different? It might be different. The Supreme Court in McCutcheon held that you couldn't have essentially a limit on the number of people that could be donated to the aggregate limit. Here you have an issue where the building fund, according to the FEC, going by their discovery responses and certified facts, the building fund, the larger contribution, though restricted, is larger, and therefore it generally can be more corrupting in the sense that that money can be used for anything. It frees up fungible money that can be used for just about any purpose. But in your view it didn't free up fungible money in the circumstances of the LNC. That's your standing argument. That's right. Here, though, the math did not work out for the LNC in 2015. There was no way for it to work out. Let me ask you just a clarifying question. I think it's your view, given the nature of a political campaign, that any legal restriction on any uses by a campaign of contributions that it received is a content-based restriction. Is that your position? That's fair to say, Your Honor, because the parties are in the business of speaking and politicking. That's what they do. If you restrict how much money they get, you're going to alter their ability to express themselves, to engage in activity. The LNC doesn't have a side business of washing cars or running a restaurant or something. It's a political party, and all they do is speech. So if you tell them you can take less money, that's going to be reducing the amount of money they can speak with. But, Your Honor, if I may just amend my immediately previous answer, it's not just that in 2015 the math didn't work out for LNC, although that's sort of a crystallized example of it. It doesn't work out every year. We have in the record evidence of donors who have maxed out, and they will not give out any more, even though they can give another couple hundred thousand dollars. They won't do it because of the restrictions. There's not anything in the record, is there, that LNC spent unrestricted funds on any of the purposes for which the segregated accounts may be spent? There's no record evidence on that one way or the other, is there? Yes, actually there is, Your Honor. We can deduce that because the LNC has never had either a presidential fund or a legal services, you know, crony bus account, but they've certainly spent money on a presidential convention, and they've spent money on legal proceedings such as this one. From 2014 forward, I mean, after this law came into effect, has LNC spent money out of an unrestricted account for purposes such that if it had... ...such that it would experience the kind of fungibility that you are ascribing to the major parties? Yes, the LNC had a presidential nominating convention in 2016, and they funded that out of their general account, even though they didn't have a presidential crony bus account, but they used, you know, it was 200-something thousand dollars. That's in the record of what they spent on their nominating convention. But you have here a party that, because it's a smaller party, it's always going to have the fungibility issue. There's no way around that. If you have one donor, like Mr. Rufer, who wants to give you, you know, more than $100,000, you're almost immediately going to have a problem, so long as you're not in the presidential election year, because at that point, the party doesn't have the ability to absorb that. And the FEC says, well, you could have spent the money that way. Well, that doesn't make any sense. Why should the LNC have a presidential nominating convention this year? Why should they be filing election contests over elections where they didn't get more than a percent or two of the vote? That doesn't make any sense. But in any event, to go way back to Judge Griffith's question. Let me just ask whether any other judges have questions. Just one, if I could. So you've told us repeatedly you're not challenging McConnell, right? And under McConnell, the pre-amendment baseline was that your clients could permissibly be prevented from accepting any contribution more than $25,000 from any one donor. Why shouldn't we use that as the baseline for assessing whether the amendments impinge on your speech rights? Because post-amendment, the only thing that's changed is you have a vastly greater ability to accept more money. I do believe the court should use McConnell. I would urge the court to follow McConnell. I simply read McConnell as supporting our argument. McConnell upheld the $25,000 restriction specifically because it did not depend upon how that money would be spent. You can still accept up to $25,000 in unrestricted funds from any given donor. And you can accept lots of other restricted funds. So you're better off in terms of your overall speech rights. The Libertarian Party is not better off, Your Honor, in the sense that it is having its speech censored by the government. The Libertarian Party objects to the idea that here's a limit. It's $339,000. That's what an individual can write a check for to the Libertarian Party, $339,000. But if that individual were to write that check, 90% of that money would be restricted in its use, mostly in ways that could not be spent. But, Mr. Gurra, you had 30 minutes for argument. To the extent that we gave you one minute more, you were better off. That doesn't mean that you have a right to go on forever, right? I mean, my point is that, as Judge Katsas was saying, it seems a little ironic that you're saying that a statute that allowed you to receive more money is somehow impinged upon your First Amendment rights than the prior regime that was upheld. How are we supposed to understand that line of thinking? The line of thinking, Your Honor, is that the Libertarian Party, like many Americans, is offended by content-based restrictions on its political speech and would like for those restrictions to be exercised. Congress made the choice, Your Honor. Congress made the choice. We did not make the choice. Congress made the choice to raise the limit. That's fine, and the Court should defer to that in crafting a remedy here. But what the Congress could not do was then put strings on how you speak with the money that you're given. If Congress thinks that more money should be in the system, that's fantastic. And, of course, the Libertarian Party's preference is there be no limits at all. We understand that's a possible remedy. We're not really expecting that. That's not really the central focus of the argument here. But if you're going to have a limit, if Congress is going to be deferred to as to how much money can be in the system, great. But there's no such thing as deference to a content-based restriction on speech. It has to meet strict scrutiny, and here it wouldn't even pass rational judgment. Let me just ask, are there other judges with questions? Thank you. Okay, well, we gave an extra 18 minutes, so count that as an advantage. We'll give you a chance to respond again. Thank you so much. Yeah. Thank you, Your Honor. And may it please the Court, Jacob Steiler for the Federal Election Commission. Excuse me. Since the first restrictions on contributions to national party committees were enacted more than 75 years ago, Congress has periodically refined those limits to balance the two interests that courts have told Congress to focus on. First, to ensure that they are closely drawn to prevent corruption or the appearance of corruption, and second, to ensure that the political parties have the ability to amass sufficient resources to compete in the electoral arena. Congress's latest refinement expanded the limits that – excuse me – Congress's most recent amendment expanded the amount that parties could raise to finance certain categories of expenses that all parties incur, while maintaining an overall cap on the amount that any individual could give to the party. How do you respond to Mr. Guru's argument that when Congress amended the act in 2014, they were saying you can give up to $340,000 approximately a year and that does not trigger corruption concerns? Because it enacted that scheme at the same time that the funds were restricted to be used for specific categories of expenses. That's Congress accepting an overall level, but understanding that the value of those higher contributions was reduced by the expenses, the types of events and activities that could be funded with that money was limited, so it reduced the amount. And once we start speaking of limits, then there has to be some anti-corruption value in those categories, right? Yes, but as the court held in McConnell, all contributions to national party committees come with a risk of corruption, and Congress understood that and reaffirmed that by saying that even with respect to these categories of expenses, there is still a corruption risk. However, because of the other side of the balance, because Congress wanted to permit parties to have access to additional So you're saying Congress said $340,000 does not trigger corruption, provided it's spent in this particular way, in these three categories? No, I don't think Congress has actually read that. How can you avoid it? That's the result of this, right? Somebody can now give up to $340,000 a year to a party, and apparently Congress has made the judgment that that doesn't trigger corruption concerns. That's on the safe side of it, provided you spend it in a certain way. Doesn't there need to be an anti-corruption value in that restriction on how it's spent? So Congress is legislating against the risk of corruption here. These are prophylactic rules that are meant to reduce the risk of corruption, so it is not the case that a contribution that is below whatever limit Congress sets is necessarily non-corrupting. If it could be proven a within-limit contribution, it could be part of a bribery scheme. So within that limit, Congress has some flexibility to balance the two sides of the coin here. Congress has to make sure that the limits generally are tailored to combat corruption. But on the other side of the coin, Congress has to make sure that there's an anti-corruption value that Congress is going after in creating these three categories where they've raised the limit substantially. So the primary concern of Congress with respect to these three segregated accounts was to ensure that the parties had the ability to amass the resources to put these kind of events, to conduct these kind of activities. I don't think it's the case. And what does that have to do with corruption? I'm missing that. I mean, it's obvious that's what they're doing. They're trying to get more money for the major parties. There's no question about it. What does that have to do with anti-corruption value? Our argument is that the overall system, capping the overall limit, fights corruption. But within that limit, Congress can create distinction to allow parties. Certainly they can. What are they here? What is it about these categories that doesn't raise the same corruption concerns that does with the general fund? Well, several. And one is that these are – because that's your burden, right? I mean, the touchstone of all Supreme Court analysis and this Court's analysis is when we're in this area, the government has a burden to show that it's pursuing some anti-corruption value. So I'm just trying to get at what's the anti-corruption value in this particular scheme that allows for higher contributions for these three categories and less for the general fund. Well, when I think – I think when Congress is lowering the limit and reducing the amount of money that parties can go, then I do think that it has to be – that that lower limit has to be tailored to corruption interest. But when Congress is expanding opportunities for parties, I think it's sufficient for them to say that although the overall amount that a person can give is limited to fight corruption interest, we're going to create distinctions to permit parties more flexibility. I don't think that an expansion of the limits necessarily has to be tied to corruption, but more to the point, there are bases to determine that these particular categories have an anti-corruption purpose. In fact, all three of these categories were regulated differently prior to BICRA, and that reflected the previous fact that they could be treated differently. Did they have higher limits? Prior to BICRA, which was reviewed in McConnell, yes, all three had different limits as has been discussed. The presidential nominating conventions, parties had sources to fund those that were through public funds, and also they could create other committees that would be subject to separate limits. Office-based spending was explicitly excluded from the definition of contribution prior to BICRA, so parties could use soft money to finance those expenses. Third, with respect to election contests and other legal proceedings, the commission had concluded, and the commission's determinations were cited in the legislative record by the supporters of this amendment, funds that went to litigation or recounts were not considered related for the purpose of influencing a federal election because a recount is not an election, so they were not regulated under FECA. That all changed in BICRA when Congress eliminated soft money for federal parties. And just to build on that point for a second, there was a discussion about whether the rule in McConnell depended on how the money was used, and it did with respect to state and local parties. State and local parties to this day may raise unlimited amounts of funds or rather limited by whatever law of the state for non-federal election activity, but their money that is used for federal election activity is limited by federal law. And then there's the Levin account, which allows additional funds to be raised for mixed purposes. There's an allocation regime that applies there. And so with that, with respect to the restrictions on state and local committees, how they raise the money, they have different accounts that have different contribution limits that depend on how the money is ultimately used by the state and local parties. That's effectively the same system that Congress adopted for these categories of expenses, but unlike with respect to the state parties, they set an overall cap on the amount that any individual donor can give, again to cite the corruption concern. Why wouldn't the recount contributions be the most potentially corrupting because that's a situation in which the election is right on the razor's edge? Well, first of all, that account covers more than just recounts. It also covers other legal proceedings. Oh, sure, but I mean someone in, say, November of 2000 pouring money into recount presumably has a particular election in mind. And indeed it could. There could be a situation that Your Honor described where whatever the particular facts of the contribution raise additional corruption concerns. But again, Congress is regulating these things at the outset. Let me clarify. When you talk about these litigation funds and there's reference to recounts, which obviously happen after the election itself has occurred, are the funds you're talking about here confined to litigation that's after Election Day, or does it also include litigation during the election or before the election? I don't like what you're doing with voter registration rolls. Keep the polls open longer. Your machines aren't reliable. Is it limited in time or is it the full period? The Commission has not adopted an authoritative interpretation of the statutory text, but the text applies to recounts, election contests, and other legal proceedings. Right, that's obviously the interesting question is what other legal proceedings. Exactly, and the Commission hasn't taken a position on that. I think that the text could be read to apply to other legal proceedings that may straddle the line between the elections. I do think it's possible that... It's important to know that to sort of sort out to understand the role of these funds and their connection to potential corruption in the electoral process. How can we analyze them without knowing what they apply to? Well, so the, I mean, it's certainly within this court's realm to construe the provision in a way that avoids constitutional questions, and so that might be an appropriate path here. I don't think in this area of law we can construe anything to avoid constitutional questions. It may change the contours of it, but there's always going to be these constitutional questions. Yes, but to the extent it matters that to the anti-corruption interest that the spending be after the election or before the election, but again, I don't think it necessarily needs to be to remain targeted at anti-corruption. It's hard to know... In many cases, it's hard to know in advance who's going to benefit from a donation to recount. In many cases, it will be obvious who it is, but in other cases, it will not be as obvious who the specific candidate that is going to benefit from the contribution if it's given before the election, for example, or if it's given generally. So like headquarters and presidential nominating conventions, these are more of the, at least as a general matter, more of the administrative-type expenses that all parties share. And to answer a question also that came up in my opponent's argument, the district court actually did make findings as to how much the LNC spends on these categories of expenses, and in fact, we know what they would have done in the absence of these accounts because they generally don't use them. And at page 188 of the Joint Appendix, the district court, it's paragraph 29, the district court found that the LNC in 2016 spent more than $450,000 that could have been defrayed using these segregated account provisions, which gets me to the jurisdictional arguments with respect to the LNC's as-applied claims. Nothing prevented the LNC from accepting the entire amount that was bequeathed to them when it was offered in 2015. The segregated accounts were sufficient for the LNC to accept the full amount of the money. Now, the debate between the parties is whether they could have spent it in 2015 and therefore defrayed the full amount that had been accepted, but there's no debate that in 2016, when this lawsuit was filed, that it had sufficient expenses to totally defray the amount that Shaver left it. By then it was locked up in escrow, and they couldn't, even if they incurred the expenses, they couldn't, without a legal ruling, they couldn't have that money released to go to those extra expenses. That's correct, but the LNC was the one that made the decision to put the money in escrow. The LNC could have instead simply accepted... Given by the statutory scheme that they're challenging. They didn't make that decision just because that's what we'd like to do today. They said the statutory scheme forced them to do it, and then by 2016 when they had more expenses, they couldn't use the funds because they had to put it in the escrow. I'm just telling you what they're saying. I understand their argument, but the statutory scheme gave them the option to do what they did if they only wanted to accept the money into their general account. They could do what they did, or they could have chosen to accept the money into the separate segregated account, and if it had done so in 2015, it might have had a stronger argument for standing because it had money in accounts that it wanted to spend on other expenses, but once that calendar changed to 2016 and it had a new set of expenses, nobody can test that its 2016 expenses were sufficient to fully offset... I was a little unclear before. Could they, in the original decision about the escrow, first taken the $33,000 change and put that into the general account? Taken $101,000, put it in the building account, and $101,000 and then say, and next year we want another $101,000 in our building account, and that would be the escrow. Right, so an escrow would not have been necessary in that situation because it could have just accepted all of the money into the various accounts had it created them. I'm particularly talking about the building account because they have a mortgage of $250,000, so they have an expense that they could pay off. They could pay off their entire debt. They say in their papers that they actually want to pay it off as soon as possible. So leaving aside the others, could they have had an escrow arrangement in which $33,000 comes out right away, so that's not escrowed. $100,000-some goes in the building account in 2015, and the remainder, according to the escrow agreement, comes into the building account in 2016. So I think they could have. The advisory opinion that the LNC cites to say that it could not have done that was directed at the specific facts that the LNC presented to the court, which didn't include the options Your Honor is suggesting. But there's nothing about the statute that would have barred them from doing that or about any FDC rules that would have barred them from doing that? None that I'm aware of, no. And so they could have done what Your Honor suggests, and that as well as the option of accepting all of the money into the segregated accounts, more than just the building accounts, would have defrayed, would have eliminated all of their injury by 2016. Now the district court found to the contrary. I'm actually not as interested in the injury question and the way in which you're describing it for standing. They still have a constitutional claim of an injury of not being able to spend the money the way they want to. I think the question really is how much of a restriction on whatever right they have to receipt. There's no associational right anymore. The person is dead. They agree with that. The only right is perhaps some vestigial right about accepting. No case has held that before. But if there is such a right, that right is pretty small since spread over two years they could have accepted the whole amount and actually used it. Is that right or is that actually wrong? It is right, as a matter of fact, because we know what their expenses actually were for those years. In 2015 and 2016 they had enough expenses to actually spend all the money and they could have accepted it. If the sole issue is the right to receive, then they could have received all of the money right away. In addition to that, based on what we know about their actual spending in the absence of having done that, they would have spent it. They could have defrayed their general spending with that money. That's both why they're not injured on our argument and more to your Honor's point, that's why to the extent there is any right to receive in the absence of donor rights, it's only at most a marginal inconvenience. You think that right to receive part of it, if you isolate it that way and you only talk about the right to receive on the part of the party, is that subject to closely drawn scrutiny or is it even lesser than that? I think we'd argue it's possibly less than that because all of the other cases that analyze contribution limits arise in a situation where there is a living donor seeking to exercise speech and associational rights. No one contests that the LNC has speech and associational rights. The only question here is how those rights apply when the donor has passed and therefore isn't associating with the party anymore. Under those circumstances, it's certainly less of an imposition on the party's right to apply a contribution limit to one particular contribution from a deceased donor. Back on the deceased donors, what is the fear of corruption in a bequest that's not coordinated? The findings of facts here was that this bequest was not coordinated. Am I right? Well, the district court also found that the LNC did solicit bequests generally, although it's not clear that it went to this particular donor, but also the LNC did solicit contributions from this donor. However, generally, yes, there was no specific allegation or evidence that this particular donation was part of a quid pro quo. So if one has a bequest that's not coordinated at all, use a hypothetical then, what is the corruption fear in that? Well, I think it goes to the broader appearance of corruption standards that the Supreme Court has applied. So for the living, if there's no— I'm not talking about the living. I'm talking about a bequest that's not coordinated. The person has died. The money has now been given. It's perhaps a surprise to the party. What's the value? What's the anti-corruption value in limiting that? Because, you know, there are examples in the record of people who gave money and either sought recognition for that or sought to be part of a quid pro— sorry, excuse me, either them or the estate representatives who were representing the estate afterward tried to influence the party with that money. And so there remains a risk of corruption. Even the LNC doesn't contest that there is a risk of corruption with respect to bequests, and that's basically what the panel— I'm not talking about bequests in general. I'm talking about a specific type of bequest, a bequest that's not coordinated. I think the lack of coordination at the outset doesn't preclude the bequest from being part of a quid pro quo corruption scheme involving close family members or estate representatives, and it also doesn't eliminate the appearance of corruption from large bequests to the party depending on the circumstances of a particular bequest. But since we're under intermediate scrutiny here, the general application of the contribution limits to bequests is sufficient to meet that scrutiny. It does not—the mere fact that certain particular bequests might not implicate an actual corruption interest doesn't invalidate the law. It doesn't make the law overbroad, and that's essentially what the court decided in Buckley, both in its over-breath discussion and in its discussion that even though there might be some kinds of contributions that raise somewhat less of a risk of corruption— the example in that case was contributions from immediate family members— even though those might be thought to be less potentially corrupting, they were not so uncorrupting that, in the generic sense, that they should be excluded from the contribution limits, and that's essentially our argument here. The statutory scheme does not allow anonymous campaign contributions or contributions to parties, right? Yes. Has that ever been challenged? What do courts say about that? Well, the disclosure provisions of FECA have been upheld consistently. I think the most recent example is probably Citizens United, 8-1, decided that the disclosure provisions with respect to independent expenditures were sufficient, but also in McConnell the disclosure provisions were upheld. But a particular as-applied, I guess, challenge to someone who wishes to make an anonymous contribution. Has there been such a lawsuit? I believe the claim in Citizens United was an as-applied claim with respect to the disclosure. I believe so, yeah. So, to the extent that there we're dealing with— well, I guess what I'm trying to get at here is Citizens United, we're dealing with an independent organization as opposed to a party, but how does that regime— or I guess what I'm getting at here, where we have contributions to a party where the court has traditionally upheld the rationale of Congress that these can be prophylactic and has fended off some as-applied challenges, even where there hasn't really been evidence in the record of a danger of corruption for that specific contribution. If we were to, I guess, recognize this claim, this as-applied claim, how would that—what would that portend for the rationale of Citizens United or other cases having to do with just disclosure provisions in general? Well, so I refresh my recollection about the history as-applied challenges to disclosure provisions, and I'm reminded of myself— I reminded myself that the rule is that unless there is evidence of threats or reprisals directed that would result from the disclosure of the individual, that disclosure is generally constitutional, even with respect to minor parties. And so I think permitting as-applied— sort of class of one challenges to an otherwise valid contribution limit would run afoul of every court that has decided an as-applied challenge in this area, and I would specifically point to the Republican National Committee three-judge court case, which was affirmed by the Supreme Court, and the Louisiana Republican Party decision, which was affirmed, again, by the Supreme Court. And in both of those cases, a political party came to the court and swore declarations or provided evidence that their activity, the contributions they were going to receive, did not implicate the anti-corruption interest, and therefore, as a factual matter, didn't raise those concerns, so they should be excluded from the general contribution limits. And both three-judge courts rejected that by saying that these are prophylactic rules. It's not just that your particular situation lacks, as a factual matter, a corruption concern. It's that Congress is regulating the risk of corruption, and it's a prophylactic rule to eliminate that risk or at least reduce it. Can you just tell me how the appearance of corruption is analyzed for purposes of answering these questions? Are we asking how would a reasonable person, a reasonable voter, interpret the quest of having and raising an appearance of corruption? I think the appearance of corruption language is there to extend the prophylactic rule beyond bribery schemes or quid pro quo, actual quid pro quo corruption that can be proven. So it's meant to target the appearance of risk, and yes, I think, the minds of the reasonable voter and the system generally. And so what is the mind of the reasonable voter supposed to know? Are they supposed to know whether the bequestor was affiliated or unaffiliated or amounts? I just don't even know how this exercise, in cases, they just talk about the risk of large donations and say nothing more, and then trying to deal with this. I wasn't even sure how we as a court are supposed to analyze looking at bequests. Do they implicate that risk of appearance of corruption? I think that's exactly why courts have extended a measure of deference to Congress in setting some of these rules and setting the level at which the dollar limit is set, and by permitting Congress a little more leniency with respect to contribution limits because they're prophylactic rules. Once it is determined that the contribution has the ability to be corrupt or appear corrupt, then that is sufficient for Congress to set a limit on those contributions, and I think that applies just as much to bequests as it would to others, to other forms of contributions as McConnell determined that all contributions to national parties can create the appearance of corruption. How far does this go? Let's suppose that the facts were that the donor had never given any money to any party ever in his or her life, and in their will they gave a million dollars to the Libertarian Party,  I think, again, that the general application of the idea that bequests can corrupt and create the appearance of corruption, which the LNC conceived, is sufficient to justify applying limits to all bequests. Is there, Mr. Stahler, any as-applied challenge to a contribution limit that you think could succeed? Yes, and, in fact, this Court held in speech now that independent contributions to groups that make only independent expenditures could not be limited. It was a challenge as-applied to those types of groups, to contributions to those types of groups, and the reason for that was, as a legal matter, the Supreme Court had held in Citizens United that independent expenditures could not corrupt as a matter of law or create the appearance of corruption. So it's sort of a categorical as-applied. Yes, and the Court has always taken a categorical approach to these issues, as the Court did in the Republican National Committee case. I still don't understand why there's not a category of bequests that are not coordinated. If you have a case where there's a bequest made, no evidence of coordination, why doesn't that fall within the same categorical analysis? Because it would still require individualized proof about the relationship between the donor and the recipient. Well, and that's also not the claim that was raised in this case. Correct. The LNP has limited its claim to this particular quest, regardless of whether it is similar to other types of bequests. It's a class of one claim they're really asserting here. But in addition to that, that kind of analysis about whether the particular facts of the bequest would require individualized proof as to whether or not that bequest was sufficiently uncoordinated, how much the individual had donated in the past, and what the relationships were require a searching inquiry into that contribution, which as a prophylactic rule, the general contribution limit, the void. So I guess I'm confused as to what you mean by that, because are you saying then that with respect to a contribution to a party, to a national party, there can be no successful as applied challenge when it's made by bequest, regardless of the circumstances? I think that's right, if I understand Your Honor's question. And that's because all contributions to those parties can create the appearance of corruption, as the McConnell Court held, and because under intermediate scrutiny as a prophylactic rule, these kinds of issues are not subject to individualized proof. As the Supreme Court said in Citizens United again, these prophylactic rules have been upheld despite the fact that many, if not all, few if any contributions subject to these limits are going to be part of a quid pro quo corruption scheme. It's enough that they can be part of a corruption scheme or appear to be that is sufficient to justify limiting those kinds of contributions. I think that same analysis would apply to bequest. How do you handle McConnell, which facially upheld contribution limits and then expressly invited as applied challenges by the nascent party, which might have trouble under those limits? The as applied challenge contemplated in McConnell was, as Your Honor says, if a minor or a newly formed party were struggling to raise resources. But that's not the case here, and it's not their claim. So, yes, if it could be shown It's a different challenge, but it just proves the point that upholding the general rule doesn't foreclose arguments about narrower subcategories or individual cases where the interests are different and your interests aren't implicated. I think that's right, but again, it's a categorical basis, or it's the same as applied challenge that the court has been suggesting since Buckley where if the limits are set at such a level that political groups or parties can't amass sufficient resources, that that becomes a severe imposition on their ability to raise money to speak. But that's not the issue here, and I don't think you can extend that kind of an analysis to a contribution limit that is otherwise that. If that's a case that's distinctive because the speech interest is higher, this is a case that may be distinctive because the government interest is lower. Perhaps, but so are the first amendment rights that issue with respect to bequest because the donor is deceased and the LNC is only asserting its own speech rights. So I think that cuts both ways with respect to this case. I do want to spend a minute talking about the- We're out of time unless other judges have questions. Thank you. I know you're out of time, but I promise you some more time, so I'll give you another two minutes, okay? Thank you very much, Your Honor. Thank you, Your Honor. The only category in Speech Now that's relevant was the no corruption category. Speech Now said that something beats nothing, and that's a proper distinction upon which to decide the Schaeber bequest. You have something here, an interest in this bequest. You have nothing in terms of a retrospective look at Mr. Schaeber's life and his nonexistent relationship with his party, at least there's no quid pro quo relationship here. There's nothing more that can be done for a person once he or she has passed. There's nothing more that that person can do as far as we know from the grave to help or hurt the political party. So, yes, the dead are different than the living, and I don't believe that any court or Congress- Just so I'm clear, I thought you had agreed to give up at least part of this argument, so this is only as applied to- That's right. It is an as-applied challenge, but setting the context here, we do see a very different universe of concerns that simply were never considered by the Congress or by other courts that have dealt with this area in the past. I think this is the first time a court has thought about this type of situation, and I don't think Congress has thought about it at all. And finally, I would only stress that, of course, however the court decides, the Schaeber bequest issue, the injury is distinct from that, brought in the facial challenge, which covers not just the Schaeber dispute, but donations generally. The record does show that the speech restrictions here, and these are content-based restrictions that the FEC has yet to offer any rational even explanation for, do impact the party generally and donors generally, and those content-based restrictions cannot be deferred to. They have to be subject to heightened scrutiny, and I submit that the government has failed to meet its heightened scrutiny burden. Thank you so much, Your Honors. Thank you, Mr. Guerra. We'll take the matter under submission. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.  Thank you. Thank you.  Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: Garland, Henderson, Rogers, Tatel, Griffith, Srinivasan, Millett, Pillard, Wilkins, Katsas